**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

MARY J. JACKSON,

                        Plaintiff,

     v.                                      No. 07-CV-1059
                                            (DRH)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
_____

**APPEARANCES:**                      **OF COUNSEL:**

BINDER & BINDER, P.C.          CHARLES E. BINDER, ESQ.
Attorney for Plaintiff
215 Park Avenue South
6th Floor
New York, New York 10003

HON. GLENN T. SUDDABY       JOHN M. KELLY, ESQ.
United States Attorney for the     Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

    Plaintiff Mary Jackson ("Jackson") brought this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner")

denying her application for benefits under the Social Security Act.  Jackson moves for a

finding of disability and the Commissioner cross-moves for a judgment on the pleadings.

Docket Nos. 7, 11.  For the reasons which follow, the Commissioner's decision is

reversed.

**I. Procedural History**

On July 21, 2003, Jackson filed an application for disability insurance benefits

pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 57-60.[1]  That application

was denied on November 13, 2003.  T. 35-38.  Jackson requested a hearing before an

administrative law judge ("ALJ"), which was held before ALJ R. Neely Owen on February

1, 2005.  T. 40-41, 339-93.  In a decision dated May 25, 2005,  the ALJ held that Jackson

was not entitled to disability benefits.  T. 251-60.  On June 15, 2005, Jackson filed a

request for review with the Appeals Council, which remanded the case back to the ALJ.  T.

261-62, 268-71.

The second hearing was held before ALJ Elizabeth Koennecke on July 17, 2006.  T.

394, 408.  Prior to the hearing, ALJ Koennecke wrote two letters to Jackson's treating

physicians, dated September 29 and November 11, 2005, seeking additional information

pertaining to Jackson's residual functional capacity ("RFC").  T. 272, 273, 279.  There was

no response.  ALJ Koennecke also called the treating physicians' offices on December 13,

2005 and June 28, 2006, seeking RFC information.  T. 280, 289.  On June 28, 2006, ALJ

Koennecke received a letter from Jackson stating that Jackson's treating physicians would

"not complete impairment questionnaires or narrative reports."  T. 300-01.[2]  In a decision

dated September 18, 2006, the ALJ held that Jackson was not entitled to disability

---

[1] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 5.  Additionally, Jackson filed a previous application for disability insurance benefits on August 15, 2002.  T. 254.  The application was denied at the initial level and never appealed.  Id.

[2] On July 10, 2006, Dr. Van Eenenaam submitted a letter on Jackson's behalf concerning her RFC.  T. 320.

benefits.  T. 19-32.  On October 11, 2006, Jackson filed another request for review with the Appeals Council.  T. 17.  The Appeals Council denied Jackson's request on August 20, 2007, thus making the ALJ's findings the final decision of the Commissioner.  T. 8-10. This action followed.

## II. Contentions

Jackson contends that the ALJ erred when she failed to (a) consider properly  the opinions of Jackson's treating physician, (b) credit properly her subjective complaints of pain, and (c) find that the record lacked substantial evidence to conclude that Jackson had the RFC to perform work which existed in significant numbers in the national economy. The Commissioner contends that there was substantial evidence to support the determination that Jackson was not disabled.

## III. Facts

Jackson is currently fifty years old and received a Master's Degree in Nutrition.  T. 357, 402.  Jackson has worked as a retail store manager, restaurant manager, and cook. T. 78, 86, 91, 98-107, 126-28.  Jackson alleges that she became disabled on July 21, 2001 from degenerative disc disease and severe back pain.  T. 21, 57, 77, 79.

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . .

." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.   Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. -4 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

4

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

### A. Medical Evidence

Jackson began receiving treatment for her back in 2000.  T. 237.  Jackson saw family nurse practitioner Debbie Krupnick from May until September complaining of back pain which would not resolve with over-the-counter pain medication.  T. 237-39, 241-42. At the beginning of June, Jackson was put on light duty work status.  T. 238.  However, Jackson's pain worsened and began radiating down her leg, eventually leading to numbness and tingling.  T. 239, 241.  In August, Jackson attempted physical therapy but found no relief.  T. 241.  On September 1, 2000, Krupnick discussed a recent MRI stating that Jackson had multiple bulging discs, referred her to an orthopaedist, Dr. Franklin Lynch, and prohibited her from returning to work until she was examined by Dr. Lynch, specifically stating that Jackson "should not do any lifting, pulling, or pushing."  T. 242, 228.

On September 18, 2000, Jackson saw Dr. Lynch complaining of persistent low back pain radiating down her leg into her calf.  T. 243.  Jackson stated that prolonged sitting, standing, and bending were problematic, that she was unable to walk more than half a mile without feeling pain, and that when she changed position, the pain increased.  T. 243, 244.  Upon physical examination, Dr. Lynch noted that Jackson leaned on her elbows to relieve the pressure on her back, she could rise from the chair smoothly, she could bend over and almost touch the floor, her range of motion was good, straight-leg raising[3] was

---

[3]A positive straight-leg, or Lasegue, test is indicative of a herniated disc in the back. See, e.g., Univ. of Fla. Dep't of Neurosurgery Patient Information (visited June 30, 2008) <http://www.neurosurgery.ufl.edu/Patients/lumbar.shtml>.

negative, and there was no lumbar spine tenderness.  T. 243.  Dr. Lynch opined that

Jackson had discogenic back pain with bulging discs and said that she should not return

to a job requiring "prolonged bending, reaching, and lifting," as "chronic repetitive lifting [is]

not a vocation [that is] recommend[ed]."  T. 244.

Jackson returned to Dr. Lynch for a follow-up examination on October 27, 2000.  T.

245-46.  Overall, her physical examination remained the same.  T. 245.  However,

Jackson complained that her pain was still persisting, the pain medication was not

controlling it, it was preventing her from prolonged sitting, reaching, or significant lifting,

and the nine weeks of physical therapy she had endured had only rendered limited

improvement.  Id.  Dr. Lynch discontinued any further physical therapy and recommended

that Jackson try crutches to alleviate some of the pressure on her back.  Id.  Additionally,

he stated that Jackson could not return to work successfully.  Id.  On December 11, 2000.

Dr. Lynch noted that Jackson was moving better but still did not recommend that Jackson

sit for prolonged periods of time or pursue regular work as she would probably fail if it was

attempted.  T. 247.

Jackson attempted to return to work at the end of 2000.  T. 378.  She returned on a

part-time basis, but it lasted only until July 2001.  Id.  On October 27, 2001, Jackson

underwent another MRI.  T. 203-04.  The MRI showed no spondylolisthesis[4] or

spondylolysis[5] although there was degenerative disc disease, disc bulges at L2-3, L4-5,

---

[4]Spondylolisthesis occurs when one vertebra slips forward over another. DORLAND'S ILLUSTRATED MED. DICTIONARY 1563 (28th ed. 1994) [hereinafter "DORLAND'S"].  The forward slippage causes the spinal canal to narrow leaving less room for the nerve roots, effectively pinching them.  See Medline Plus (visited July 2, 2008) <http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm>.

[5]Spondylolysis is the "dissolution of a vertebrae." DORLAND'S 1563.

and L5-S1, some stenosis at L3-4, and potential mild narrowing of the central canal at L4-5.  T. 203.

Jackson underwent chiropractic treatment in September 2002.  T. 231-33.  Jackson continued to complain of lower back pain which radiated into both her legs, made it difficult to sit, stand, do housework, bend, do light lifting and walk, and precluded her from exercising and hunting.  T. 231, 232.  The chiropractor noted that Jackson walked with difficulty, appeared to have restricted movements, and had an extremely decreased range of motion in her spine.  T. 232.  However, the chiropractor also noted that by following the prescribed treatment plan, Jackson "should return . . . to a pre-injury status . . . ."  T. 233.

On February 13, 2003, Jackson began seeing her treating orthopaedist, Dr. David Van Eenenaam.  T. 173-74, 229-30.  Jackson reported that she had been seeing a chiropractor for her neck but that the chiropractor refused to treat her back although he or she had told Jackson that from x-rays, her back appeared out of alignment.  T. 173, 229.  Jackson complained primarily of lower back pain which radiated down her right leg with associated paresthesias[6].  Id.  Dr. Van Eenenaam noted that although Jackson had lumbar spine tenderness upon palpation and a decreased range of motion, she ambulated without support or assistance, was able to heel and toe stand, had mildly irritable straight-leg raises, and symmetric reflexes.  T. 174, 230.  While Dr. Van Eenenaam could not render a formal interpretation of Jackson's x-rays, he stated that she had degenerative disc disease and disc bulges and was "unable to do any work that require[d] prolonged standing, walking, heavy lifting, repetitive bending or stooping."  Id.  He also recommended

_____

[6] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus."  DORLAND'S 1235.

Jackson continue with physical therapy and taking over-the-counter pain medication.  Id.

A few days later, Jackson attended physical therapy.  T. 209-10.  Jackson stated that the pain was still radiating into her legs, the right worse than the left, and that frequently throughout the course of a day, her toes would numb.  T. 209.  The physical therapist noted major limitations in Jackson's range of motion and difficultly ambulating and transferring positions as well as decreased strength throughout the right lower extremity and decreased sensation to light touch.  T. 210.

Jackson saw Dr. Van Eenenaam on March 19, 2003.  T. 170-72.  Physical therapy had exacerbated her symptoms.  Id.  The physical examination yielded similar results of a relatively normal gait and posture, the ability to heel and toe stand, positive straight-leg raising on the right, and limited range of motion.  Id.  Jackson was classified as having "a partial disability, [which is] probably permanent."  Id.

On April 10, 2003, Jackson underwent another MRI.  T. 205-06.  The MRI showed a mild disc bulge, mild canal narrowing and other degenerative changes at L4-5, and a mild disc bulge, mild degenerative changes, and marked foraminal stenosis[7] and nerve truncation at L5-S1.  T. 205.  On May 1, 2003, Dr. Van Eenenaam and Jackson discussed the results of the MRI and Dr. Van Eenenaam noted no change in her condition except that Jackson had some paresthesia in her toes.  T. 170, 171.

A few days later, Jackson had another appointment with Dr. Van Eenenaam complaining of a marked increase in pain.  T. 166, 167, 169.  Physical examination

---

[7]Central and foraminal narrowing, also called spinal stenosis, is spinal canal or foramina constriction resulting in back pain caused by pressure being exerted on the nerve roots.  THE MERCK MANUAL 477 (17th ed. 1999).

showed a limited range of motion, positive straight-leg raises at 60°, and no muscle weakness or sensory deficit except for the paresthesias in the right foot.  Id.  Jackson had appointments with Dr. Van Eenenaam in June and July, with little change.  T. 165-66, 167. In July, Dr. Van Eenenaam concluded that Jackson "remains disabled for work that requires heavy lifting, repetitive bending, stooping, etc., [and was] . . . only able to do sedentary things."  T. 165, 211, 213.  Dr. Van Eenenaam also referred Jackson to a pain clinic to attempt to manage her symptoms.  Id.

On October 16, 2003, Jackson was evaluated by Dr. Gerald Amatucci from the New York State  Office of Disability Determination.  T. 175-77.  Jackson reported that she was unable to lift more than five or ten pounds, sit for more than fifteen minutes, stand for more than twenty minutes, or walk more than a quarter of a mile.  T. 175.  Dr. Amatucci noted that Jackson had a reasonably good range of motion, no areas of tenderness or spasm, positive straight-leg raises at 30° and 70°, full motor strength, and normal gait and station.  T. 176-77.  Dr. Amatucci stated that his "objective findings [were] consistent with minimal decreased capacity related to heavy work, particularly lifting, bending, and squatting."  T. 177.

On October 17, 2003, Jackson underwent an x-ray of her lumbosacral spine.  T. 178. The x-ray showed degenerative disc disease and osteoarthritic joint changes, including decreased disc space height, osteophyte formation, and mild discogenic spurring.  Id.  The following week, Jackson saw Dr. Van Eenenaam.  T. 211, 213.  Although it had been four months, Jackson was still continuing to have low back pain radiating down her leg and intermittent paresthesias in her great toes.  Id.  Her prescription medication was not giving her much relief and she was experiencing much discomfort after standing for a prolonged

period of time.  Id.  Jackson was still ambulating independently, could heel and toe stand,

did not have particularly irritable straight-leg raises, and was awaiting contact from Dr. Van

Eenenaam's referral to the pain clinic.  Id.

On November 5, 2003, Jackson underwent a physical RFC assessment.  T. 182-89.

The report stated that Jackson was able to lift and carry fifty pounds occasionally, lift and

carry twenty-five pounds frequently, stand and/or walk for six hours in a workday, sit for six

hours in a workday, and utilize hand and foot controls without limitations.  T. 183.  This

assessment was based on Dr. Amatucci's normal physical examination results and Dr.

Van Eenenaam's notes that Jackson ambulated independently and must remain "disabled

from work that requires heavy lifting, repetitive bending, stooping, etc."  T. 183-84.

Additionally, the RFC analyst stated that "[b]ased upon the clinical findings, [Jackson's]

allegations with respect to her limitations are credible, but not to the degree alleged."  T.

188.  The analyst concluded that Jackson retained the RFC to perform her prior work as a

retail and restaurant manager.  Id.

On February 23, 2004,Dr. Van Eenenaam found that Jackson was continuing to have

low back pain which was now radiating down both of her legs, though mainly affecting the

right side.  T. 212-13.  Although Dr. Van Eenenaam stated that Jackson "look[ed] healthy"

and ambulated well, she was still experiencing sensitivity in her lower back, a limited range

of motion, and positive straight-leg raises at 60°.  Id.  In October, Dr. Van Eenenaam

evaluated Jackson again.  T. 217.  Although Jackson was still ambulating without support

and had no gross weaknesses, Dr. Van Eenenaam ordered another MRI because she had

a very limited range of motion in her back, straight-leg raising was significantly irritable on

the left side, and the symptoms appeared to be getting worse.  Id.  Jackson saw Dr. Van

11

Eenenaam again at the end of October, feeling subjectively better but without any significant physical changes noted.  Id.

On December 17, 2004, Jackson underwent her fourth MRI.  T. 317-18.  The procedure revealed that Jackson was suffering from degenerative disc disease, mild central canal narrowing at L4-5, moderate to marked neural foraminal narrowing at left L5-S1, mild narrowing at left L4-5 and right L5-S1, and disc herniations at L4-5 and L5-S1.  T. 318.  This finding had not significantly changed from the last MRI taken on April 10, 2003. Id.  Three days later Jackson had an appointment with Dr. Van Eenenaam.  T. 217-218, 309.  Again, there was no significant change noted, but Dr. Van Eenenaam did state that Jackson's MRI results confirmed the signs and symptoms she had consistently complained of for the last three years.  Id.  Dr. Van Eenenaam also wrote Jackson a prescription for a cane.  T. 227.

On January 4, 2005, Dr. John Krawchenko, a neurologist, noted that Jackson was in moderate discomfort and that sitting, standing, and walking on her heels and toes increased her level of pain.  T. 215, 248.  Additionally, it was noted that although Jackson had normal strength and sensation in both legs and feet, she favored her left leg and had moderate muscle spasms.  Id.  Dr. Krawchenko recommended that Jackson continue with pain medication, therapy, changing positions to increase comfort, and using heat and ice to alleviate soreness.  T. 216, 249.  He further recommended that Jackson visit the pain clinic and found that she remained totally and permanently disabled.  Id.

On February 1, 2005, Jackson testified at her first administrative hearing.  T. 339-93. Jackson stated that she was in the process of obtaining her Master's Degree and that she spent approximately twenty hours a week doing school work in an at-home, independent

study program.[8]  T. 365.  She stated that the pain in her back was a burning sensation that radiated predominately down her right side but also affected her left side.  T. 369.  In order to help alleviate the pain, Jackson reclined on her back with a pillow under her knees for approximately half an hour, about five times per day.  T. 370.  Additionally, she used a cane anytime she left her apartment and had rails in her bathroom which assisted her in independently carrying out her daily personal routine.  T. 371-72.  Besides her school work, Jackson spent her days reading, researching, and crocheting.  T. 373.  However, she could not sit for more than twenty minutes at a time.  Id.  Although she could drive, Jackson testified that she could not sit in the car for extended periods of time, so she only drove approximately ten to thirteen miles a week.  T. 374.  She was unable to hike, bike, hunt, do heavy housework, go shopping independently, wait in line for more than fifteen minutes, walk more than a quarter of a mile, or lift more than eight pounds by herself.  T. 374-379.  Jackson estimated that she could only sit at a table for half an hour at a time, four hours in total, if she was permitted to rise and lie down during the day.  T. 377.

During the hearing, a vocational expert also testified as to Jackson's RFC.  T.388-90. The vocational expert stated that all of Jackson's previous work was classified as light and skilled, although as Jackson described it, her job as a retail manager would be classified at the medium level.  T. 388.  Additionally, the vocational expert testified that Jackson had

---

[8] Maureen Kravec, Jackson's Mentor and Graduate Coordinator from Empire State College, wrote a letter on February 8, 2005 explaining Jackson's course of study.  T. 205. Jackson's graduate program was characterized as a program in guided independent study where Jackson completed her course work through meetings with Kravec and Kravec's colleagues, telephone conferences, and electronic mail.  Id.  Additionally, because Jackson could not sit at a computer or typewriter for extended amounts of time, she would write her assignments in long hand and send them to a scribe for word processing.  Id.

attained transferrable skills in her capacity as a manager and that she could work as a telephone operator or clerical staff, which would both classify as sedentary jobs.  T. 389. Based on the disability analyst's consultation report, the vocation expert concluded that Jackson was capable of performing the full range of medium work, but if Jackson's testimony was given full credibility, she would have no viable occupational base at any exertional level.  T. 390.

A few days later at an appointment with Dr. Van Eenenaam, Jackson presented with pain, and a radicular ache in her left leg, although her right leg was also in pain.  T. 309. Jackson hypothesized that her symptoms were aggravated by an increase in activity and a persistent cough.  Id.  On August 2, 2005, Dr. Van Eenenaam noted that Jackson continued to have back pain with acute episodes radiating down her legs, she was still ambulating independently, she had soreness in her back, restricted but improved range of motion, and irritable straight-leg raising, particularly on the left, at about 60°.  T. 309. Although Dr. Van Eenenaam stated that Jackson's condition was stable, he still classified Jackson with a "permanent partial disability of at least moderate severity in that she could not do anything that requires heavy lifting, bending or stooping."  T. 310.

On November 10, 2005, Dr. Van Eenenaam reported that Jackson was still experiencing chronic pain, which was radiating down her left leg with an incident of numbness in her thighs.  T. 310.  Jackson asked about a motorized wheelchair.  Id.  Dr. Van Eenenaam noted that she clinically looked healthy and ambulated well although there was definite soreness in her back, a restricted range of motion, and an irritable straight-leg raise on the left at 70°.  Id.

On February 10, 2006, Jackson complained of increased irritability in her back,

contending that she was so sore that she was unable to get up and walk.  T. 310-11, 313, 315.  Dr. Van Eenenaam noted that Jackson ambulated cautiously, had an appreciable amount of muscle tightness and soreness, had a limited range of motion in her back, and irritable straight-leg raises at 60°.  Id.  Jackson was given the prescription for the wheelchair because it was "very difficult for her at times to get up and around and walk comfortably."  Id.  Jackson continued seeing Dr. Van Eenenaam, in March, April, and July.  T. 313, 315-16, 321, 328.  At each visit, Jackson complained of pain and paresthesias down her left leg and her range of motion became progressively worse.  Id.  On July 10, 2006, Dr. Van Eenenaam wrote that Jackson was still experiencing discomfort and radiating pain and that she was unable to do work that required prolonged standing, sitting, heavy lifting, bending, or stooping.  T. 320.

On July 17, 2006, Jackson testified at her second administrative hearing.  T. 394-408.  Jackson stated that her condition had worsened since the last hearing as her pain progressed down her legs and she had sustained a decreased ability to walk, shop, clean, and do other "normal" activities.  T. 399.  Jackson contended that she used her cane and wheelchair whenever she left her apartment because of her pain.  T. 400.  She estimated that she had about ten good days a month, where the pain was tolerable.  T. 401.  Jackson maintained that she could only sit comfortably for twenty minutes before needing to rise and walk around.  T. 403.  Additionally, she stated that she was able independently to complete her daily activities, although she had modified how she did them by using a computer chair with wheels while cleaning and doing the dishes, and a hand-held shower head to bathe.  T. 404.

On October 12, 1006, Jackson complained to Dr. Van Eenenaam of an increase in

her lower back ache which radiated to both legs.  T. 328.  Additionally, she noticed a soreness in her right shoulder which she hypothesized was due to her compensating for her back injury when lifting herself out of the tub or a chair.  Id.  Dr. Van Eenenaam noted that while there was no major change, Jackson ambulated cautiously and her lower back was quite irritated.  T. 328.   An x-ray of the shoulder showed some early osteoarthritis.  T. 329.  Dr. Van Eenenaam referred Jackson for a nerve conduction study.  T. 328.

On May 29, 2007, Jackson underwent a nerve conduction study.  T. 335-38.  Jackson reported that her pain was subjectively greater on her left than right, exacerbating factors included walking and stretching, and she changed positions and stayed off her feet to alleviate and avoid pain.  T. 335.  It was noted that Jackson had a normal gait and station, examinations of bother her lumbar spine and lower extremities were "essentially normal," straight-leg raises were grossly negative, and her test results were "mildly abnormal . . . [due to] mild, chronic or old left and right L5-S1 radiculopathy."[9]  T. 336, 338.

## B. Treating Physician's Rule

Jackson contends that the ALJ did not give proper weight to the opinion of Dr. Van Eenenaam.  The Commissioner states that the ALJ properly determined the weight to be given to the treating source.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d

---

[9] Radiculopathy is a "disease of the nerve roots."  DORLAND'S 1404.

123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

The ALJ gave the opinion of Dr. Van Eenenaam only some weight regarding the nature and severity of Jackson's impairments because (1) he "declined to elaborate on [Jackson's] abilities (i.e. pounds and hours)," (2) "his restrictions [did] not eliminate all light and sedentary work," (3) the restrictions "are not well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not consistent with other substantial evidence of the record or consultative examination," and (4) Dr. Van Eenenaam "stated that the objective medical evidence does not support the severe complaints alleged."  T.

17

29.  Conversely, the ALJ accorded the consultative physician's opinion that Jackson had a "minimal decreased capacity related to heavy work, particularly lifting, bending and squatting . . . significant weight as it is supported by the clinical and objective evidence of record."

To dismiss a treating physician's opinion and rely on a consultative medical examiner's opinion, the ALJ must provide good reasons.  These reasons are articulated above but are neither good nor supported by substantial evidence in the record.  While it is true that Dr. Van Eenenaam did not provide a specific RFC assessment with regard to the exact weight Jackson could lift and amount of time she could sit and stand, he did state that Jackson was unable to do work that required prolonged sitting, standing, heavy lifting, bending or stooping.  T. 320.  This letter is consistent with the host of physical limitations Dr. Van Eenenaam had provided since 2003.[10]  T. 165, 174, 211, 213, 230, 310, 313, 315-16, 320, 321, 328.  The fact that the ALJ regards this information as insufficient to determine or evaluate Jackson's RFC is unfounded as the terms the Social Security Regulations and Rulings used to explain the requirements of light and sedentary work do not include such rigid requirements.  See 20 C.F.R. §404.1567 (a) & (b) (defining sedentary and light work as occupations which "involve[] sitting [with] a certain amount of walking and standing . . . necessary . . . ," and "require[] a good deal of walking or standing, or . . . , sitting most of the time with some pushing and pulling of . . . controls,"

_____

[10] On July 22, 2003, Dr. Van Eenenaam stated that Jackson was "only able to do sedentary things." T. 165, 211, 213.  However, the ALJ was not obligated to accept this characterization as it went to the heart of the degree of Jackson's disability, a decision reserved for the Commissioner.  Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(e).

respectively); SSR 83-10 (defining both sedentary[11] and light[12] work for which a person is able to sit or stand not solely in terms of the amount of hours).

Moreover, the ALJ's contention that Dr. Van Eenenaam's restrictions prohibiting prolonged sitting and standing do not eliminate the basis of sedentary and light occupations is false.  Jackson was neither able to stand nor walk for six hours in a workday as she could not stand or sit for a prolonged period of time.  Thus, neither exertional level presented a viable occupational basis for Jackson.

The ALJ also states that Dr. Van Eenenaam's assessments were neither well supported by or consistent with substantial evidence in the record.  This assertion is incorrect.  Jackson underwent three MRIs after her alleged date of onset which showed bulging discs, both mild and marked stenosis and foraminal narrowing, nerve truncation, and herniations.  T. 203-04, 205-06, 317-18.  Furthermore, nerve conduction studies yielded "mildly abnormal [results indicating] mild, chronic or old left and right L5-S1 radiculopathy."  T. 336, 338.  Additionally, even though Dr. Van Eenenaam's records show variable results for Jackson's gait, tenderness to palpation, range of motion, and straight-leg raises, the record overwhelming shows decreased and limited ranges of motion and positive straight leg-raises as well as multiple instances of spinal tenderness and cautious

---

[11] Sedentary work primarily involves sitting "approximately 6 hours of an 8-hour workday"; however, "a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally [no more than about 2 hours of an 8-hour workday] . . . ."  SSR 83-10. Additionally, "[b]y its very nature, work performed primarily in a seated position entails no significant stooping."  Id.

[12] Light work "requires a good deal of walking or standing . . . [or] sitting most of the time but with some pushing and pulling of . . . controls, which require greater exertion than in sedentary work . . . ."  SSR 83-10.

ambulation.  T. 165-67, 169, 170-72,174, 210, 211-213, 217-18, 230, 309-111, 313, 315-16, 320, 321, 328.  These results were confirmed by chiropractic and physical therapy records which indicated extremely decreased ranges of motion and Jackson's appointment with a neurologist, Dr. Krawchenko, who indicated that Jackson was in discomfort, suffering from moderate muscle spasms, and favoring her left leg over her right.  T. 231-33, 209-10, 215-16, 248-49.  Moreover, Jackson was prescribed, and frequently used, a cane and wheelchair.[13]  T. 227, 311, 313, 315, 400.

Furthermore, the ALJ is willing to dismiss the treating physician's opinion in favor of the consultative medical examiner who stated that Jackson only had a "decreased capacity related to heavy work, particularly lifting, bending and squatting."  T. 177.  Even if Dr. Van Eenenaam's opinion was not entitled to controlling weight, which is not the case, the consultative opinion was improperly granted significant weight.  The opinion was rendered after one physical examination, as opposed to the relationship cultivated by Dr. Vab Eennenaam in the years of treating Jackson.  Furthermore, as previously discussed, the consultative opinion is inconsistent with the record as a whole.  Additionally, the consultative opinion was rendered by an internist as opposed to an orthopaedist, who was better qualified to assess the specific physical ailment presented here.

---

[13] It appears that the ALJ specifically relied on the fact that Dr. Van Eenenaam did not immediately prescribe Jackson a wheelchair and noted that she appeared fairly healthy and able to ambulate without assistance as significant evidence that Jackson was not suffering as severely as she contended.  T. 29.  However, this is mitigated by the fact that Dr. Van Eenenaam later did prescribe Jackson the wheelchair as it was "very difficult for her at times to get up and around and walk comfortably."  T. 311, 313, 315.  Also, the fact that Jackson is able to ambulate independently for a short distance and period of time is neither contrary to Dr. Van Eenenaam's recommendations precluding prolonged sitting and standing nor indicative of a non-disabling impairment.

Lastly, the ALJ contends that Dr. Van Eenenaam "stated that the objective medical evidence does not support the severe complaints alleged." T. 29. This assertion misinterprets the record. Dr. Van Eenenaam's treatment notes state that, after receiving the December 2004 MRI results, the changes which have occurred are "[c]ertainly . . . significant enough to cause the symptomatology and signs [Jackson] has." T. 217-18. Dr. Van Eenenaam's RFC letter also validates Jackson's various allegations. T. 320.

Accordingly, the Commissioner's finding in this regard is reversed.


### C.  Subjective Complaints of Pain

Jackson contends that the ALJ's decision to discredit her subjective complaints of pain was in error. The Commissioner contends that the ALJ properly considered Jackson's symptoms.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin.,

No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the

claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Jackson "is not entirely credible [and her] allegations are not accepted on their face at least not to the extent alleged." T. 30.  The ALJ stated that because Jackson was able to retain sufficient concentration to complete her Master's Degree successfully, the pain she was experiencing could not be as severe as she alleged.  Id.  Additionally, because Jackson retained the ability to grocery shop and do general housework by rolling while seated in her office chair, she was "ab[le] to perform at least sedentary work."  Id.

While Jackson was able to complete her Master's Degree in two years, she also completed it at home and at her own pace.  Jackson testified that she could generally only devote four hours per day to her school work.  T. 365.  Additionally, she was given a major accommodation, the use of a scribe, as Empire State College recognized Jackson's inability to sit at a word processor or computer for any extended amount of time.  T. 250.

23

Additionally, Jackson's ability to complete her daily activities had diminished and was not as easy as the ALJ characterized it.  T. 399.  While Jackson retained her independence by adapting to her surroundings, such as using a computer chair to clean the refrigerator and do the dishes and used a hand-held shower head to wash her hair, this does not automatically translate into the ability to perform sedentary work.  See Bromback v. Barnhart, No. 03-CV-4945 (NRB), 2004 WL 1687223, at *7 (S.D.N.Y. July 28, 2004) (quoting Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("[D]aily activities may be used to show that a claimant can work, but only insofar as there is evidence that the claimant engaged in the activities for 'sustained periods comparable to those required to hold a[n exertion level] job.'").  In fact, Dr. Van Eenenaam's findings precluding prolonged sitting would indicate the complete opposite.

Additionally, Jackson has also testified that she only had about ten good days a month where her pain was tolerable.  T. 401.  On those days, if Jackson was venturing outside the house, she used either her cane or wheel chair.  T. 371-72, 400.  Additionally, approximately five times a day, she reclined for half an hour with a pillow under her legs to alleviate the pain in her lower back and legs.  T. 370.  Jackson has attempted various medications, physical therapy, chiropractics, and activity limitation.  T. 320.  None of these conservative treatments have been effective.  Jackson has not been recommended to undergo surgery.  However, this does not mean that Jackson's credibility has been diminished.  See Rivera v. Barnhart, No. 04-CV-6149 (CJS), 2005 WL 3555501, at *9 (W.D.N.Y. Dec. 9, 2005) ("[C]onservative treatment for pain is not, in and of itself, a sufficient basis for rejecting an applicant's complaints.") .

Therefore, the Commissioner's determination on this ground is reversed.

24

**D. RFC**

Jackson contends that substantial evidence does not support the ALJ's findings

regarding his RFC.

RFC describes what a claimant is capable of doing despite his or her impairments

considering all relevant evidence, which consists of physical limitations, symptoms, and

other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d

145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC,

the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory

statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at

150.  RFC is then used to determine whether the claimant can perform his or her past

relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir.

1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

The Grids do not provide the exclusive framework for making a disability

determination if a claimant suffers from non-exertional impairments that "significantly limit

the range of work permitted by exertional limitations."  Id. at 39 (quoting Bapp v. Bowen,

802 F.2d 601, 604-05 (2d Cir. 1986) (citation omitted)).  Rather, the ALJ should elicit

testimony from a vocational expert to determine if jobs exist in the economy that the

claimant can still perform.  Bapp, 802 F.2d at 604-05.  Work capacity is "significantly

diminished" if there is a loss of work capacity that narrows the possible range of work

available and deprives the claimant of a meaningful employment opportunity.  Id. at 605.

Non-exertional impairments include "difficulty performing the manipulative or postural

functions of some work such as reaching, handling, stooping, climbing, crawling, or

crouching."  20 C.F.R. § 404.1569a(c)(1)(vi) (2005).  The applicability of the grids should

be considered on a case-by-case basis.  Bapp, 802 F.2d at 605.  However, the "mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines."  Id. at 603.

Here, the ALJ concluded that Jackson retained the RFC to perform light duty work and thus was capable of performing her past relevant work as a restaurant manager, retail manager, and executive chef as generally performed in the national economy.  T. 30.  The ALJ adopted "[t]he previous testimony of the vocation expert and findings of the previous Administrative Law Judge . . . ."  Id.  However, for the reasons discussed supra, the ALJ's decision is not based on substantial evidence as Jackson was unable to perform light duty or sedentary work due to her inability to sit and stand for prolonged periods of time.  Additionally, the vocational expert stated that if Jackson's testimony was adopted as true, there was no viable occupational base for her at any exertional level.  T. 390.

Accordingly, the Commissioner's determination in this regard is reversed.


## E. Remand or Reversal

A reviewing court has the authority to reverse with or without remand.  42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).   In this case, there is persuasive proof of disability in the record and an additional remand would not serve any purpose.

26

Accordingly, the decision of the Commissioner is reversed.


### VI. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the decision denying disability benefits is **REVERSED**, Jackson's

motion for a finding of disability (Docket No. 7) is **GRANTED**, and the Commissioner's

cross-motion (Docket No. 11) is **DENIED**.


DATED: June 30, 2008
      Albany, New York

_____
United States Magistrate Judge